The next case today is Markham Concepts, Inc. v. Hasbro, Inc. Appeal Number 191927. Attorney Pallaro. Good morning, Your Honors. May it please the Court. My name is Robert Pallaro, appearing on behalf of Appellants Markham Concepts, Inc. and the Markham Parties, collectively referred to as the Markham Parties. With the Court's permission, I respectfully request three minutes be reserved for rebuttal. Yes. Thank you, Judge Thompson. Most of us know the Game of Life as one of the most iconic and successful board games since it was created in 1959. A half century of unambiguous written record identifies Bill Markham as the designer of the game and the individual responsible for inducing the game to, quote, concrete form, end quote. Despite this unwavering evidence, the lower court decision completely rewrote history, finding instead that Bill Markham did not reduce the game to concrete form and that his promoter, Reuben Klamer, was his employer and thus entitled to the copyrights on the game. Isn't your task a little bit, at this point, given the factual findings that the Court made below, don't you have to establish, well, isn't it clear it was a work for hire by someone? Just a question of for whom? It seems the Court found that Chambers and Israel did most of the creative work and actually reduced ideas to expressions. And if that's the case, then it doesn't matter whether it's Markham or Klamer who was the hirer, does it? Your Honor, I think that's a good point. And if you accept the premise that that is the world in which the facts came out, then yes, that is the case. But as you'll see in our briefing and as we'll talk today, that is not the case. And that understanding is inconsistent with the 60-year unambiguous written record. And we'll talk about that in years. So your position is that the Court's findings were clearly erroneous? That is correct, Your Honor. And, again, we laid that out in our briefs. And, again, you know, it's sort of related to the late defense. For 60 years, the record was clear. There's no hint, suggestion that anyone other than Bill Markham created this game physically and as a whole until this late defense  Well, let me ask you this. If one believes the testimony of Chambers and Israel, how do you then argue that they weren't the creators? Your Honor, I'll answer it this way. The testimony that came out at trial in no way rose to the level that these individuals created the physical prototype. Neither one of the witnesses could testify anything about how the final game was created, how it was put together, how it was bound, how it came to be in its final form. And that is crystal clear in the record. What is in the record as well, and one of the very few, I would say, undisputed points from that time, was that Bill Markham at the Chasen's dinner actually placed the track on the board for the first time. And that is the aha moment of when the prototype was created. And so the testimony that Ms. Chambers and Mr. Israel presented was drafting, sketching. Both witnesses had no idea and could not guess who actually created the physical prototype. Obviously, they were avoiding saying Bill Markham, but Bill Markham is the one who took all these disparate pieces, was guiding this, and that's what the 60-year written record is unambiguous about. There is no mention of Ms. Chambers or Mr. Israel in the contemporaneous written record period. Just so I understand, I guess, the import of the point now being made, if as a factual matter those individuals were the creators of the game, this whole debate about work for hire and which standard applies, whether it's under the 1909 Act or the 1978 Act, none of that matters anymore. Is that correct? I mean, it's just your client would have no copyright claim at all because he was not the creator of the game. Is that correct? Judge Lippis, I actually wouldn't agree with that. And the reason I wouldn't agree with that is because this issue is tied hand-in-hand or certainly interrelated with the slate defense. So, again, the 60-year written record, no mention of these two individuals with any substantive contribution, period. And so it wasn't until after the close of discovery that the appellees were permitted to put in a defense that, for the first time, suggested or argued that anyone other than Bill Markham was the creator of this game. And so, quite frankly, we've laid out the harm that's in our brief. It's substantial. Were you able to depose Chambers and Israel after this defense came forward? Absolutely not. I was denied. Quite frankly, our briefs make it clear. Not only do we believe it was abuse of discretion to not only have the defense allowed in, but also our alternative request for discovery was denied. It was how it was done to us. We were told in an unreasoned text order on the literal eve, not the figurative eve of trial, the day before trial started, that this new defense would be in. And my request for discovery was denied. Were Chambers and Israel listed as potential witnesses by the defendants? They absolutely were. And the other point I want to make real quick is that these two witnesses were represented by the same counsel as Mr. Klamer and have been for months, if not years. And so that is a critical fact. So you could have deposed them if they were listed as potential witnesses? I did depose them, but not on this new theory, which was, quite frankly, a sea change from what the 60-year written record had been up to that point. Up to that point, as I mentioned, there was no mention of Ms. Chambers or Mr. Israel, period, in the written record for 60 years. Their name was... Counsel, isn't it... But the district court did not... You're characterizing this as a late defense. The district court did not decide the case on that basis, correct? I mean, the court decided the case on the basis it had been at the forefront of all the discovery, namely that Mr. Klamer was the employer and this game was created at his instance and at his expense. Isn't that so? Again, I respectfully do not agree. Baked into the district court's opinion, again, for the first time, was the predicate that anyone other than Mr. Markham created this game. And so that was the foundation, quite frankly. It opened the door for the judge to find on a theory that neither party had put forward, and half of which was the late defense, i.e. that someone other than Mr. Markham created this game. And simply, again, that goes partly to this issue of the late defense and the clear error sort of go hand in hand. They don't rise and fall together, but they certainly go hand in hand. That they were, for the first time, again, put into this defense of their own witnesses after fact discovery was over. Are you saying that Klamer never asserted prior to that time that he was the creator? For a very short period of time, Mr. Klamer asserted that he was a joint author of Mr. Markham. But quite frankly, that defense was abandoned because on the first day of trial, Mr. Klamer testified unambiguously that he never physically created anything and had not. And so that defense went away very quickly with that statement. Weren't they saying Klamer hired CPD and Chambers and Israel were the people whose salaries he paid who did the work? Well, that's, again, nowhere in the contemporaneous record. There is one passing reference to… Forget about the contemporaneous record. I'm talking about the trial record in this case. That's what you have to live by. I don't care what the rumor was. I don't think we care what the rumor was. But let's take the trial record in this case. I had understood that an argument was made that Klamer hired CPD and the Chambers and Israel did the work. And it was a work for hire for Klamer as the hire. That was a theory that the judge adopted. Again, that was a theory that was not put forth by anybody. The theory that the late defense that was put in after closure of discovery was that the work was a work for hire for Mr. Markle. But I'm talking about the Klamer one. Didn't the court hold that it was a work for hire for Klamer? Exactly. And quite frankly, legally, it's not even sure that that's possible. Take it a second. Didn't that put at issue… wasn't that the theory that the Chambers and Israel did the work through CPD for Klamer? That is correct. And that's the response to the previous question. So when you deposed Chambers and Israel, you had every incentive in the world to ask them what they did, when did they do it, which of them did it, and what did Markham do that they didn't do? Let me be clear. The theory up to that point was that Bill Markham created the game for Mr. Klamer. But I'm talking about the trial testimony. So when I deposed them, I didn't have the benefit of the trial testimony. So up until the trial, no, there was no… when I deposed them, the words that came out of their mouth were routine in Markham's direction. Sir, Patrice, focus. When you did depose them, didn't you have an incentive to find out from these two eyewitnesses who were indisputably involved in some respect in the creation of the game, didn't you have an incentive to ask them who did what? And for whom? Precisely. And under the theory of the case at the time, I did ask those questions. Okay. And then they also testified at trial as well, didn't they? They did. And was the trial testimony consistent with the deposition testimony? Absolutely not. It was built upon. It was much more recollection. And quite frankly, that's the harm that we were put in. We were put in a position of trial by ambush, of not having… Did you impeach them with their deposition? It was brand new testimony. So yes, we certainly attempted to do that. And it was, again, a different story that had simply never been told before and completely inconsistent with the written record. And again, I just want to mention before we leave this point, there's a plethora of other issues that were raised by this defense. For example, the potential for joint authorship with Bill Markham. And those were questions that could have never been foreseen to be asked at the deposition. And I was certainly not in a position to ask those for the first time or should not have been in a position to have to ask those for the first time at a trial. So give us an example of something they said at trial that contradicted something they said when you deposed them. The first one that came to mind was that they were unaware of who created the physical prototype. At the depositions, it was relatively clear that everything was being done for Bill Markham. At the trial, Bill Markham, they claim, was in absentia and was not available. Council, excuse me, please. No, no, go ahead. Go ahead. For either now or I guess if you reserve some time for rebuttal, I'd like you to address the assignment agreement between Markham and Link, which favorably to you seems to acknowledge that Mr. Markham was the inventor and creator. And to the extent that he has a copyright interest, he should protect it. I mean, theoretically, that document would allow you to overcome the presumption that this was a work for hire in light of the factual findings that the court made. I was somewhat troubled by the way in which the district court sort of dismissed the significance of that. I wonder if you, is this something you could address? Is your time now up on direct? No, it's okay. I want to hear the answer to that one too. This time is up, but that's okay. Thank you, Your Honor. I appreciate it. And quite frankly, I couldn't agree more. And so the assignment agreement in this case makes it clear that the rights, including the copyrights, would, quote, revert, end quote, to Markham under certain circumstances. And again, because my time is over and I'm in overtime, I'll just be very quick. The sine qua non of the reservation of rights is the intent of the parties. And so we think it's crystal clear by using the word revert, the parties understood and were acknowledging that any rights, including the copyrights, which are specifically mentioned, did not vest initially in Claymore and returned to Markham in certain situations. And the last point I'll make on this very, very quickly is in this case, it's hard to believe that the intent of the parties could not be more clear. Markham himself testified under oath that with respect to the reversion of rights provision in his testimony in 1989 that was admitted into Evans, but nowhere in the opinion, quote, the whole game returned to me, end quote. If Rubin, Claymore and Link didn't perform under the agreement, that, quite frankly, should end the inquiry right there. The fatal flaw with the decision below, it is devoid of any analysis regarding the party's intent of the provision at the time was entered into. Thank you, counselor. Any other questions for my colleagues? Thank you. Thank you. Attorney Krumholtz, please unmute. And would Attorney Pallaro please mute his video? You may proceed. Good morning, your honors. It may please the court. I'll begin by perhaps addressing the last point raised with regard to the assignment agreement. It is the case that if there is a clear contemporaneous document that suggests that there was an agreement, that could undermine the presumption established by the instance of expense test. But this document does not do that. What this document talks about is it's basically a belt and suspenders provision that states that to the extent to which Mr. Markham may be entitled to a panel plea of intellectual property rights, then certain obligations arise, including that he would have to honor any request to, for instance, get copyrights. If, in fact, he had authorship and ownership rights in him. That provision does not itself vest anyone with any rights. It doesn't vest Mr. Markham with any rights. It just says to the extent he has them, there are the actions that he needs to follow. And I would submit that the subsequent behavior is entirely consistent with the fact that he didn't have any copyright interests. Because if you look at what happened thereafter, the only thing he was ever asked to do was to ask to apply for a patent. He was never asked to apply for a copyright. Copyrights were applied for, but never by him, never with his rights attached to them. At the same time, Mr. Klamer, and this is prior to even the assignment agreement being executed, was acting as the copyright owner. He talked to his lawyer to make sure that all copyright interests were being protected. He talked to Milton Bradley to explain to them what was the best way to protect the copyright interest. So, yes, there is that contemporaneous provision, but that hardly establishes any kind of clear expression of intent among the parties of copyright ownership that would override the presumption. To the question that was asked earlier about the incentives that Mr. Pallaro had during discovery, it is entirely accurate to say that they had every incentive in the work for hire context to ask who did what and when. But the incentive actually goes much deeper than that because their first burden is to prove authorship. That's the first element. They have to show that Bill Markham was an author for copyright purposes. There are two ways to do that under copyright law. One of them is you're a legal author on a work for hire basis. That's obviously out. You can't prove it that way because that's an exception to 304C. So the only way he could prove it was to show that Bill Markham physically created some aspect of the prototype, which is the subject of the copyrights. So he needed to prove that Bill Markham physically created that prototype. So he had every incentive to ask those witnesses who were on the ground who created what. And it's entirely inaccurate to say that they said anything inconsistent at trial with their testimony, their deposition testimony, their testimony at trial merely elaborated on their testimony at deposition. They answered all questions truthfully and accurately to the extent we asked more at trial to fill in the gaps. None of that was inconsistent. As your Honor, Judge Thompson mentioned, you know, if that were the case, they certainly had the opportunity to cross-examine and impeach with that deposition testimony.  Clearly, the factual record establishes that Judge Smith's findings were not clearly erroneous. To the extent that they say that we were late, one, as we've established, there was no prejudice. They say they would have taken additional discovery, but they've never identified what discovery that would be. And for the reasons we just talked about, there was no additional discovery to take. But two, we were just reacting to what seemed to be a novel undisclosed theory by them. We could not understand how they were trying to prove authorship because they were offering no evidence. And when they started to ask these very specific questions about the employment relationship between Ms. Chambers and Mr. Israel on the one hand, and Mr. Markham on the other, over time, even though it was not disclosed, it occurred to us that they must be trying to claim their work as his own. And we merely responded to that by saying, well, if you're going to do that, as your honors observed right at the outset, well, that's a work for hire, too. So that doesn't get you out of your box. So that's all we did. And I would observe that Mr. Klamer, and Ms. Glazer can talk about this in more detail than me, Mr. Klamer, when he filed his answer to the Third Amendment complaint, sought a declaration on this very point. And they have not addressed that at all. So they can't claim surprise, nor can they claim prejudice. And as the court has observed, either way, whether we go with an agency test or we go with the instance and expense test, they cannot prevent. Five minutes remaining. Thank you. Could you go back to the assignment agreement? I mean, does the agreement say to the extent he has any rights, or does it just say he's assigning his rights, titles, and interests? It does. It says, the phrase is, to which, you know, then says Markham, or it doesn't use the word Markham, but it refers to him. But it says, and I'm quoting, to which Markham may be entitled. But what about paragraph three of the recitals? I don't have it in front of me. Is that concerning his, the fact that he's an inventor? At the request of Link, Markham has invented, designed, and developed a game tentatively known as the Game of Life. Yes. I guess it doesn't say he has authored, is that? That's exactly right. So this has been the fundamental disconnect that we've had with them from day one. Bill Markham and Reuben Klamer provided ideas. We have never said, we've never asserted at any point in this process that Bill Markham did not play a role in this process. I will concede that he played a meaningful role in this process. That does not make him a copyright author. Copyright does not protect ideas, it protects the expression of ideas. To be the copyright author, you need to have physically created the work that was copyrighted. So to the extent Reuben Klamer came up with all the fundamental ideas, he's still not a copyright author except he became one by virtue of the work for hire. To the extent Bill Markham came up with the idea of the spinner, as they claim and we haven't disputed because it doesn't matter. That doesn't make him a copyright author. And that's been the fundamental disconnect we've had with them from the beginning. They say look at all these documents. All these documents tell us that he was the person that invented and designed and did all that. But that still doesn't make him a copyright author. Now he could have been for a moment in time in the kind of legal fiction of the passing from Mr. Israel and Ms. Chambers to him to Mr. Klamer, right? But that doesn't help them because 304C accepts that scenario from its rules. So I'm glad you're on our end because that's the fundamental problem that they've had with this case from the beginning. And that is why we also have an alternative basis that they've never proved authorship because the only thing they've actually proved is that he played a role and perhaps a meaningful role. But they've never put in any evidence to show that he physically created anything. And even if they had, Judge Smith on a very well-supported record has concluded that he has not created, he did not create anything. So even before Work for Hire, I guess in the theory that they have to meet their elements first, they never actually proved authorship to begin with. So there are three, in our view, there are three independent grounds upon which they lose this appeal. The district court came down, it seems to me, on the grounds that it was Klamer for whom a Work for Hire was done. The alternative ground is it was Markham for whom a Work for Hire was done. The common element being that it was a Work for Hire. If we were to affirm, do we need to specify, does it make any difference whether we specify which theory? It does not make any difference at all because their fundamental point has been that the forward court was wrong in applying the instance and expense test and it should be the agency test articulated in Reed. And to your Honor's point, it does not matter which area of law we apply. If it is the instance and expense test, which is the law of the circuit and under San Juan Cable, in our view, absolutely should be upheld by this panel. Then the judge's affirmative ruling that the Work for Hire was done at Klamer's instance and expense, then we prevail there. But if they're right, and of course we disagree with it, but if they're right and Reed, the agency test in Reed controls, then it's a Work for Hire for Mr. Markham and they can't win. There's no path for their winning. What about the claim that he put down the track? We will credit that he put down the track. It was a dramatic move of going to the dinner with Milton Bradley at an expensive restaurant in Los Angeles and they brought the whole board and they dramatically put down the last piece of track to show Milton Bradley the completed work. That's not physical creation. Everything was created by, in terms of the board, was created by Ms. Chambers. He didn't create anything. Assembling and disassembling a work is not a creative act. It's a mechanical act. Any additional questions? Thank you, Counselor. Thank you, Your Honors. Thank you, Attorney Krumholz. Please mute your audio and video. Attorney Glazer, please unmute your audio and video and proceed with your argument. Good morning, Your Honors. Again, Patricia Glazer, if it pleases the Court. I am Mr. Klamer's attorney and I'm going to try to answer a couple of the questions that have already been asked of other counsel. It does matter to us, Mr. Klamer, with respect to whose instance and expense this occurred. There's no termination rights under any theory, so Mr. Krumholz and I are completely on the same page on that. However, the copyright holder is rightfully Mr. Klamer and the reason... Oh, we lost her voice. I think you're muted, Attorney Glazer. You hit something and muted yourself. I'm sorry. You're back. We can hear you again. I've hit something inappropriately. I apologize. It's okay. So back up a little bit, please. Mr. Klamer, and it's uncontested, the evidence was determined by the Court that all of the following people were telling the truth. Mr. Klamer, Mr. Israel, and Ms. Chambers. The Court found, and you have to have clear evidence to the contrary or clearly a mistake, and there's not even remotely that opportunity here, that Mr. Klamer came clearly to Mr. Markham and his company. Mr. Israel and Ms. Chambers clearly performed the work. If you want to ask about the track, the track was... They literally brought the game to this restaurant. It's referred to as an expensive restaurant, that expensive restaurant, and it was literally people just assembling what Ms. Chambers had designed and Ms. Chambers had built. So the notion that he literally put the track on the board is of no consequence whatsoever. It was built by Ms. Chambers. Mr. Israel did the box. Nobody contested that. And this notion that they had a different testimony at the deposition than they had at trial is completely wrong. It's not even remotely the case, and I could go through it line by line, but I don't think that's necessary for your honors. Counsel, can you clarify? So if Chambers, it sounds like you're acknowledging that Chambers and Israel did much of the creative work, the inventive work, well beyond just an idea. I mean, they took an idea and they implemented it. Is it your position that they did that as a work for hire for your client, Mr. Klamer? Through perhaps Markham as an intermediary, but whatever they did was done as a work for hire for your client. Is that what you're arguing? 100%. I want to be so clear about that. Yes, sir. We are arguing and not just arguing. We think the record fully supports the notion that Klamer comes to Markham, Markham puts his two employees on this, and that they were paid completely and promised to be paid well before the $5,000 advance was made by the Milton Bradley folks. Milton Bradley now has growth and no question about that. And nobody suggested to the contrary. Well, what difference could you help us? What difference does it make to you if we start out assuming that Chambers and Israel were the authors? What difference does it make to you if it was done by them as a work for hire for Markham or CPD, who then assigned it to Link on the one hand, or they did it as a work for hire for Klamer, who assigned it to Link? Why do you care which route it takes? Under either theory, you're partially correct, Your Honor, in our view. Under either theory, there's no termination rights. I want to be 100% clear. So in that sense, it doesn't, does not matter. Where it matters is who's the copyright holder at the copyright author, forgive me. And the copyright author, because it was uncontested at trial, that Klamer, the only thing that was contested is the expense issue, because the instance issue was not contested at trial whatsoever or in deposition or in any other form. So Klamer brings it to Markham. Markham puts his two employees on it. They create this game, and it was supervised by Klamer. He's there all the time. I'm glad to answer any other, he's there and he directs both of them on what to do, what's acceptable, what's not acceptable. That's why we think the evidence has not been refuted at all, Your Honors. I'm glad to answer any other questions. I'm still having difficulty understanding why Klamer cares which route the work for hire was done by, as long as it ends up with Link in the end. It matters only in this sense. He is, Klamer is the copyright holder. Klamer behaved as if he were the copyright owner from the first instance. Before signing the so-called assignment agreement, he asked his lawyer to evaluate the game, to determine if it was copyrightable. All of this is in the record. He sent a letter to Milton Bradley offering suggestions about the game's copyright notice. Thirty years later, Klamer had his counsel write to Hasbro to remind them of the 28-year term of the copyright on the Game of Life, and it was about to expire at the end of the calendar year 1988 unless timely renewed. He is the copyright holder, copyright author, copyright owner, and it should be recognized as such. But in terms of termination rights, Your Honor is 100% correct it doesn't matter. Counsel, this case is all about termination rights. You seem to be suggesting we should also resolve a dispute that's not really at the heart of this case. It's the termination rights market, that's what's at the heart of this case. Why should we reach out to resolve an issue that does not appear to be central to this case? I'm going to answer in two respects. One, you are correct, it has nothing to do, there are no termination rights, period. Having said that, the reason the evidence was all before the judge, and it was not refuted about whose instance and whose expense this was handled, it was always Mr. Klamer, and the evidence, nobody has to go outside the record or make a reach in any respect at all. It is clear that Mr. Klamer is the copyright author, and it should be recognized as such, and we don't think it's a stretch at all, it's there, 100% on the record. Thank you very much. Did Klamer file a counterclaim or ask for declaratory judgment that he was the owner? Yes. Yes. Okay. Okay, thank you. Thank you very much. Thank you, Attorney Glazer. Please mute your audio and video. Attorney Pallaro, please unmute your audio and video and proceed with your three minutes of rebuttal. Thank you. So a couple things. First of all, I'm surprised to say this, but on the point of whether or not it matters on the work for hire theory, on who could potentially be the author, I agree with my learned friend there, Ms. Glazer. It absolutely matters, and we do have a declaratory judgment on who the author is. So this case is not exclusively about termination rights. I want to be clear about that. So my friend brought up the issue of Mr. Klamer's testimony. What she failed to mention is there was critical impeachment in that case at trial, and it was ignored by the judge. And, for example, in 1989, Mr. Klamer testified that he had no firsthand knowledge about Ms. Chambers and Mr. Israel's contributions to the game and only secondhand knowledge. In other words, he was told by Bill Markham what they were doing. And so that's the story that changed from the trial testimony, and it's, quite frankly, seminal to the story, the words untethered to any facts in this case, the written record, that is the ultimate problem here. They came up and the policy rationale cannot be understated about what's happened here. They've literally taken an eraser out. So you're saying that Klamer never claimed earlier that he supervised the creation of this game? In 1989, he was asked a question, did Leonard Israel work on this game? And his response was, Bill Markham told me that he did. And that's exactly the problem we have. And so it's literally this case comes down to the mountain, quite frankly, the surprisingly large mountain of contemporary evidence that we have. That answered a slightly different question than the one I asked. I'm trying to figure out if in 1989 there was any testimony because today he's saying that he actually supervised and managed the creation of this. Is there anything from 89 in which that's so indicated? Absolutely not. And that was a critical impeachment that was at trial. And so you bring up an interesting point, Your Honor, that I want to just address very briefly. The Markham parties have never disputed that Ms. Chambers and Mr. Israel were employees in the dictionary sense that they work for Bill Markham. Obviously, the term employer is used in the context of the act in a much different way. And so that obviously has been an area of dispute, certainly since the new defense came in. But so I raise this point while we're talking about Mr. Klamer and his prior testimony. He believed and he testified that he believed Mr. Israel and Ms. Chambers were independent contractors. Now, why is that a big deal? Well, when the assignment agreement was entered into in this case, both parties had attorneys. Mr. Klamer sought advice of counsel, had a counsel work with him on the assignment agreement. He described, I'll just finish this one point. And so he later sought the rights of only Bill Markham, even though he believed and he testified erroneously that he believed Ms. Chambers and Mr. Israel were independent contractors. So he spoke to an attorney and after speaking to an attorney, he only sought the rights of Bill Markham. That speaks volumes about what he believed at the time, not 60 years later, you know, based on what they can muster up as recollection. I do want to be very clear that the average age of the three witnesses all represented by the same counsel on the other side was 90 years. That was the average age. And so what this case boils down to is the evidence. And at the time, Mr. Klamer didn't think it was important enough at all to seek the assignment rights from what he believed to independent contractors, Chambers and Israel. And that's exactly because they didn't have any rights to give. And so I'll cite I'll give you the site for that case that spells out that point. Exactly. Very succinctly picture music. And it's 314 F's up, 640, 652. And that's exactly the point. He didn't seek their rights because there were no rights to seek. Thank you, Counselor. Any additional questions for my colleagues? No. OK, thank you. Thank you. That concludes the argument in this case.